# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

## TAMPA DIVISION



MONIQUE PENNINGTON,

    Plaintiff,

v.

                                           Case No. *8:26-cv-1505-TPB-AAS*

ZELIS HEALTHCARE, LLC,

    Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

Plaintiff Monique Pennington files this Complaint against her former employer, Zelis Healthcare, LLC, for unlawful race discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.

### PARTIES

1. Plaintiff Monique Pennington is a Black woman, a citizen of the United States, and a resident of Hillsborough County, Florida.

2. Plaintiff is a former employee of Defendant Zelis Healthcare, LLC.

1

IFP

3. Plaintiff was hired by Defendant in Hillsborough County, Florida and performed services for Defendant in Hillsborough County, Florida.

4. Defendant Zelis Healthcare, LLC is a healthcare technology company doing business in Florida, including through its office located at 570 Carillon Parkway, Suite 500, St. Petersburg, Florida 33716.

5. Defendant employed more than fifteen employees during the relevant period and was an employer within the meaning of Title VII.

**JURISDICTION AND VENUE**

6. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under Title VII and 42 U.S.C. § 1981.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), 42 U.S.C. § 2000e-5(f)(3), and Local Rule 1.04 because Plaintiff resides in this District, Defendant conducts business in this District, and the unlawful employment practices occurred in Hillsborough County, Florida, within the Tampa Division of the Middle District of Florida.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8. Plaintiff filed a Charge of Discrimination with the Florida Commission on Human Relations on May 19, 2025. The charge was cross-filed with the Equal Employment Opportunity Commission.

9. The EEOC issued Plaintiff a Notice of Right to Sue dated February 17, 2026.

2

10. This Complaint is filed within ninety (90) days of Plaintiff's receipt of the EEOC Notice of Right to Sue.

11. A copy of the EEOC Notice of Right to Sue is attached as Exhibit A.

12. Plaintiff has satisfied all conditions precedent to bringing this action.

**FACTUAL ALLEGATIONS**

13. Plaintiff is a Black woman and a member of a protected class.

14. Plaintiff interviewed with multiple members of the Data & Analytics Operations leadership team, including the Director and the managers who later supervised her, and was selected for the Data Analyst position based on her qualifications and experience working with healthcare data.

15. Plaintiff received and accepted an offer of employment in late March 2023 after completing a multi-step interview process with the unit's leadership.

16. Plaintiff began employment with Defendant on or about April 17, 2023, as a Data Analyst within the Insights and Empowerment division.

17. Plaintiff was the only Black Data Analyst within the relevant operational unit, and based on Plaintiff's observations during her employment, the broader division also lacked racial diversity.

18. Plaintiff's assigned manager was the only manager who reported to the Director during Plaintiff's employment until a second manager was added shortly after Plaintiff's start date.

3

19. Shortly after Plaintiff's start date, a Business Analyst who supported the SmartShopper product was promoted to Manager and, upon that promotion, began reporting to the Director along with the unit's original manager.

20. Plaintiff was immediately reassigned to this newly promoted Manager as her sole direct report.

21. Plaintiff reported under a unified chain of command led by the Director of Enterprise Operations - Data & Analytics, who oversaw all Data Analysts regardless of which manager handled day-to-day supervision.

22. Plaintiff identifies the non-Black Data Analysts in the same decision-making unit as similarly situated comparators because they performed materially similar Data Analyst work, reported through the same Director, and were retained during the RIF.

23. This unit supported two products that relied on similar processes: S365, including Price Transparency and Provider Search, and SmartShopper, including incentives. These products required the ingestion, validation, and analysis of eligibility data, benefit plan data, and claims data, resulting in materially similar workflows across the unit.

24. Although S365 and SmartShopper used different systems and data structures, both relied on eligibility, benefits, and claims data.

4

25. Plaintiff's technical background enabled her to adapt quickly to the unit's analytical workflows.

26. Plaintiff's role, responsibilities, and job expectations were materially similar to those of the other Data Analysts in the unit, all of whom were supervised by Data & Analytics Managers reporting to the same Director.

27. Upon Plaintiff's reassignment, there was no change in duties or job expectations.

28. Plaintiff's newly assigned manager immediately subjected Plaintiff to heightened and atypical supervision, including requiring Plaintiff to remain on-screen in one-on-one video meetings for substantial portions of the workday, while the other analysts were non-Black and did not receive the same treatment.

29. The manager also required Plaintiff to provide a separate morning daily task report, even though Plaintiff was already required to report the same information during team sprint meetings.

30. The non-Black Data Analysts were not subjected to comparable continuous video observation or duplicate daily reporting requirements.

31. Plaintiff was subjected to disparate scrutiny regarding her work, while non-Black analysts who made comparable or more significant errors were not subjected to similar corrective action or oversight.

32. A less-experienced non-Black analyst whom Plaintiff trained was promoted into the Data Analyst role shortly before the RIF.

33. On or about mid-August 2023, Plaintiff raised concerns about discriminatory treatment after being accused of "disrespectful" communication based on a mischaracterization she believed was racially biased.

34. Plaintiff escalated this concern to the department Director. This report constituted protected activity under federal law.

35. Despite Plaintiff's report to upper management regarding racial stereotyping, she was still required to conduct a candidate interview upon short notice.

36. A few days after reporting discriminatory treatment, Plaintiff requested a meeting with her supervisor to address communication concerns and provided written solutions to improve collaboration.

37. Following Plaintiff's report of discriminatory treatment, the department Director initiated recurring one-on-one meetings to discuss workplace concerns.

38. On or about August 25, 2023, approximately one week after Plaintiff raised concerns about discriminatory treatment, Plaintiff took a mental health day due to stress and the emotional impact of the incident.

39. Around the same time period, Plaintiff experienced professional distancing from her manager, including being disconnected on professional networking platforms.

40. Around this time, Plaintiff informed the department Director that her supervisor was treating her differently than other team members.

41. Around this time, Plaintiff informed the department Director that her manager was mischaracterizing her routine business communication in a way that Plaintiff perceived as stereotyping and inconsistent with how other team members were treated.

42. Plaintiff raised concerns about daily video meeting requirements that were not imposed on others. The Director suggested that Plaintiff request certain adjustments, including submitting updates in writing and modifying the frequency of one-on-one meetings.

43. Plaintiff followed the recommendations, and the manager accepted them.

44. The Director stated to Plaintiff that there would be "no hard feelings" if Plaintiff sought employment elsewhere, which Plaintiff perceived as discouragement from remaining with the company rather than an effort to resolve her discrimination complaint.

45. In the months following Plaintiff's protected activity, Plaintiff experienced a noticeable shift in workplace treatment.

46. Plaintiff experienced a reduction in visibility and professional opportunities.

47. Plaintiff was removed from routine client meetings that she had previously attended as part of her core responsibilities.

7

48. Non-Black analysts were not removed from these meetings and continued to receive visibility and client-facing opportunities.

49. This exclusion reduced Plaintiff's visibility and client-facing responsibilities after her protected activity.

50. During this period, Plaintiff also observed a change in how her professional input was received, including unusually dismissive responses that were inconsistent with prior interactions.

51. Additionally, high-level research assignments that Plaintiff had historically been assigned due to her subject-matter expertise were reassigned to other analysts, marking a significant departure from established workflow.

52. Plaintiff's attempts to provide process-improvement feedback were met with disengagement, further contributing to the pattern of marginalization that developed after her protected activity.

53. On March 26, 2024, approximately 24 hours before the layoff, Plaintiff's manager assigned her new research work outside the standard task-tracking system, indicating continued reliance on Plaintiff's subject-matter expertise.

54. On March 27, 2024, Plaintiff was informed during a brief virtual meeting with her manager and a People & Culture liaison that her position was being eliminated as part of a reduction in force.

8

55. Plaintiff's Data Analyst position was the only Data Analyst position within the unit selected out of eight.

56. Defendant retained a non-Black analyst employee who had no prior Data Analyst experience and had been promoted into the role only months before the RIF; Plaintiff trained this employee.

57. Although Defendant asserted that Plaintiff's position was eliminated, a non-Black contractor continued performing Data Analyst functions under the same Director, demonstrating that the core duties of the role remained necessary.

58. The departmental Director, who also oversaw Plaintiff's work and was included on the meeting invitation, did not attend the layoff discussion.

59. During the meeting, the People & Culture liaison stated that a "business decision" was made and told Plaintiff not to "take it personal." The liaison conducted only a brief search for internal opportunities, with no meaningful exploration of reassignment or transfer options.

60. In the days following the layoff announcement, Plaintiff continued to receive contact to assist with benefits data issues, and she was added to client communication channels to address ongoing questions.

61. Following the layoff announcement, Plaintiff continued to experience isolating and dismissive treatment from leadership while also being asked to support ongoing operational work.

62. Plaintiff was also asked to support a client discussion on a complex "place of service" data discrepancy, an issue she had previously raised concerns about, where her concerns were dismissed and the research assigned to another analyst. This further demonstrated that her expertise remained necessary despite the claim that her position had been eliminated.

63. Plaintiff possessed substantial healthcare data experience, benefits-data knowledge, and subject-matter expertise relevant to the Data Analyst role.

64. Plaintiff trained the retained analyst after his promotion, and leadership routinely relied on Plaintiff's expertise.

65. Plaintiff had no performance issues, disciplinary actions, or negative documentation during her employment, and Defendant never placed Plaintiff on a performance improvement plan.

66. Plaintiff consistently met expectations and received positive feedback from leadership and colleagues.

67. No objective explanation was provided for retaining a less-experienced analyst over Plaintiff.

68. On April 8, 2024, Plaintiff submitted a formal request for review of the layoff decision to the company's compliance department, identifying procedural irregularities and raising concerns that her selection may have been influenced by prior differential treatment rather than legitimate business criteria.

69. Plaintiff's active work concluded on April 12, 2024.

70. On May 28, 2024, Plaintiff received formal severance documentation confirming her separation.

71. On July 18, 2024, Plaintiff met with the Vice President of People & Culture regarding concerns about the layoff decision.

72. During that meeting, Plaintiff was informed that her grievance had been reviewed by legal counsel and another People & Culture business partner. The Vice President acknowledged that the company had not communicated the results of that review to Plaintiff before the meeting.

73. Plaintiff was never contacted to provide information or participate in any investigative process.

74. After the meeting, the Vice President provided Plaintiff with the company's severance policy and requested a follow-up meeting to discuss Plaintiff's concerns.

## COUNT I

### Race Discrimination in Violation of Title VII

75. Plaintiff realleges and incorporates paragraphs 1 through 74 as if fully set forth herein.

76. Plaintiff is a Black woman and a member of a protected class under Title VII.

77. Plaintiff was qualified for her Data Analyst position and performed her duties satisfactorily.

11

78. Defendant subjected Plaintiff to disparate treatment because of race, including heightened scrutiny, differential supervision, exclusion from opportunities, and disparate application of performance expectations.

79. Defendant selected Plaintiff, the only Black Data Analyst in the relevant unit, for termination during the March 27, 2024 RIF.

80. Defendant retained non-Black Data Analysts, including a less-experienced analyst whom Plaintiff trained and a contractor performing Data Analyst functions.

81. Defendant's stated reason for Plaintiff's termination was false, inconsistent, or pretextual because Defendant continued to rely on Plaintiff's Data Analyst and subject-matter expertise immediately before and after the purported elimination of her position.

82. Plaintiff suffered damages as a result.

## COUNT II

### Retaliation in Violation of Title VII

83. Plaintiff realleges and incorporates paragraphs 1 through 74 as if fully set forth herein.

84. Plaintiff engaged in protected activity when she reported concerns regarding discriminatory and racialized treatment to management in August 2023.

85. Defendant was aware of Plaintiff's protected activity.

12

86. After Plaintiff engaged in protected activity, Defendant reduced Plaintiff's visibility, excluded her from client-facing opportunities, reassigned work historically assigned to her, and selected her for termination during the RIF.

87. Defendant's actions would dissuade a reasonable employee from complaining about discrimination.

88. Defendant's stated reason for Plaintiff's termination was false, inconsistent, or pretextual.

89. Plaintiff suffered damages as a result.

## COUNT III

### Hostile Work Environment in Violation of Title VII

90. Plaintiff realleges and incorporates paragraphs 1 through 74 as if fully set forth herein.

91. Plaintiff is a Black woman and a member of a protected class under Title VII.

92. Plaintiff was subjected to unwelcome race-based harassment and differential treatment, including heightened scrutiny, continuous video observation, duplicate reporting requirements, racialized mischaracterization of her communication as "disrespectful," exclusion from client-facing meetings, reduced visibility, dismissive treatment, and differential supervision not imposed on similarly situated non-Black analysts.

93. The conduct was not isolated and continued over the course of Plaintiff's employment, including before and after Plaintiff reported discriminatory treatment.

94. The conduct was severe or pervasive enough to alter the terms, conditions, and privileges of Plaintiff's employment by subjecting her to materially different supervision, diminished professional opportunities, reduced client-facing responsibilities, and a racially hostile working environment.

95. Defendant knew or should have known of the hostile environment because Plaintiff reported discriminatory treatment, differential supervision, and racialized stereotyping to management.

96. Defendant failed to take prompt and effective remedial action.

97. Plaintiff suffered damages as a result.

## COUNT IV

### Race Discrimination in Violation of 42 U.S.C. § 1981

98. Plaintiff realleges and incorporates paragraphs 1 through 74 as if fully set forth herein.

99. Plaintiff is Black and is protected by 42 U.S.C. § 1981.

100. Plaintiff had an employment relationship with Defendant involving the making, performance, and termination of contractual employment rights.

101. Defendant intentionally discriminated against Plaintiff because of race in the terms, conditions, privileges, and termination of her employment.

14

102. But for Plaintiff's race, Defendant would not have subjected Plaintiff to the discriminatory treatment alleged herein or selected her for termination while retaining similarly situated non-Black analysts.

103. Plaintiff suffered damages as a result.

**COUNT V**

**Retaliation in Violation of 42 U.S.C. § 1981**

104. Plaintiff realleges and incorporates paragraphs 1 through 74 as if fully set forth herein.

105. Plaintiff engaged in protected activity by opposing race discrimination and racialized treatment in the workplace.

106. Defendant was aware of Plaintiff's protected activity.

107. Defendant retaliated against Plaintiff by reducing her professional opportunities, marginalizing her, and selecting her for termination.

108. But for Plaintiff's protected activity, Defendant would not have subjected Plaintiff to the retaliatory treatment alleged herein or selected her for termination.

109. Plaintiff suffered damages as a result.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendant;

B. Award back pay, front pay, lost benefits, and other economic damages;

15

C. Award compensatory damages for emotional distress, humiliation, reputational harm, and other non-economic injuries;

D. Award punitive damages as permitted by law;

E. Award prejudgment and post-judgment interest;

F. Award Plaintiff her costs incurred in this action and, if represented by counsel at any later stage, reasonable attorney's fees as permitted by law;

G. Grant injunctive and equitable relief as appropriate; and

H. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Monique Pennington

Pro Se Plaintiff

PO Box 82023

Tampa, FL 33682

(813) 591-0247

mpenn0001@gmail.com

Date: 05/18/26